Filed 12/17/20  P. v. Henderson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES ROLAND HENDERSON,<br><br>    Defendant and Appellant. | H046281<br>(Santa Cruz County<br>Super. Ct. No. F23406) |

## I.    INTRODUCTION

On June 30, 2013, forty-year-old defendant James Roland Henderson murdered his mother, age 68, and his father, age 71.

A jury found defendant guilty of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special circumstance allegation that defendant committed multiple murders (§ 190.2, subd. (a)(3)).  At the conclusion of a sanity trial, the jury determined that defendant was sane when he committed the murders.  The trial court sentenced defendant to two consecutive terms of life without the possibility of parole, imposed various fines and fees, and ordered restitution.

Defendant contends the trial court improperly instructed the jury with a pinpoint instruction on imperfect self-defense, excluded the statements of a deceased witness, admitted evidence that defendant was a trust beneficiary, allowed the prosecution to

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

question him regarding his religious beliefs, imposed a parole revocation restitution fine, and imposed fines and fees without determining his ability to pay. In addition, defendant claims that the cumulative effect of the trial errors mandates reversal.

For reasons that we will explain, we will strike the parole revocation fine and affirm the judgment as modified.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Prosecution Evidence*

### 1. Background Evidence

E.H. and J.H. married in December 1967. They moved to Aptos in 1982. E.H. was a founder of America Online and had also worked for NASA and IBM. E.H. played violin with the San Jose Symphony for 10 years and both she and J.H. were generous donors of the Santa Cruz Symphony. J.H. was the city engineer at the San Jose Airport and a real estate investor. By 2013, both E.H. and J.H. were retired.

E.H. and J.H. had one biological child, M.H., and adopted defendant when he was nine months old. E.H.'s sister, P.L., was close to the family while the children were growing up. She never observed any violence by E.H. and J.H. toward the children, although they occasionally spanked them.

Defendant started to get into legal trouble in middle school or high school. By his late teens, defendant no longer lived with E.H. and J.H. although he sometimes he stayed with them. At some point defendant went to prison.

E.H. was closer to defendant than J.H. J.H. set the house rules and did not permit defendant "to do certain things or smoke certain things." J.H. disciplined defendant but was not violent with him. E.H. and J.H. supported defendant, buying cars and giving him money.

---

[2] Because defendant raises no claims pertaining to the sanity phase trial, we do not summarize the evidence from that phase.

In the years before E.H.'s and J.H.'s deaths, defendant did not attend family functions and M.H. rarely saw him. E.H. and J.H. always let M.H. know if defendant was going to be in Oakland, where M.H. lived, because they knew M.H. was afraid of him. M.H.'s children were not allowed to spend time with defendant or go to E.H. and J.H.'s home while defendant was there. E.H. and J.H. were also often uncomfortable with or afraid of defendant. At one point defendant stayed in E.H. and J.H.'s home, but J.H. wanted him to move out and E.H. eventually agreed.

There was also a time when defendant was not allowed in E.H. and J.H.'s home at all. Once, defendant threatened to kill E.H. and J.H. and "take their house." On another occasion, defendant told J.H., "You guys are getting old, it's time for you to let me take over your house." Defendant had also walked around outside E.H. and J.H.'s house with an ax. Defendant had threatened to harm E.H. approximately five to 10 times. E.H. once came home to find the side door to the house broken in and defendant sitting in the living room. E.H. had a friend stay with her because she was scared.

In the year preceding E.H.'s and J.H.'s deaths, defendant was not allowed to be in E.H. and J.H.'s house after dark. Defendant occasionally had meals with E.H. and J.H. at their home and attended church with E.H. Defendant was also around outside a lot.

E.H. still spoke to defendant regularly, tried to get him to go to church with her, and tried help him as much as she could. E.H. continued to give defendant her love and monetary support.

### 2. Events Preceding the Charged Incident

Sometime in June 2013, M.H. received a text message from defendant stating something to the effect of, "Everyone left is fixing to suffer, that is my greatest wish." M.H. was "extremely freaked out" by the message and discussed it with E.H.

On June 21, 2013, California Highway Patrol Officer Jacob Gonzales stopped defendant for speeding on Highway 1 in Santa Cruz County. Defendant was driving his silver BMW. Officer Gonzales had defendant's vehicle towed because defendant's driver's

license was suspended. The only damage Officer Gonzales observed to the BMW was some body work on the right rear door.

Richard Bays owned the towing company that towed defendant's BMW. When defendant first tried to pick up his vehicle, Bays told him he needed go to the California Highway Patrol for authorization because he did not have a license. Defendant was "[e]xtremely agitated."

On June 24, 2013, Defendant rented a blue Toyota Yaris. The rental agent was familiar with defendant because he had given defendant a ride earlier that year. Defendant had appeared dazed and in a trance during the ride. On June 24, defendant was more interactive. Defendant asked whether rental insurance provided coverage for striking a pedestrian. The rental agent told him that it would so long as he was not under the influence of drugs or alcohol when the accident occurred. Defendant purchased the insurance. There was no damage to the Toyota when defendant rented it.

On June 25, 2013, defendant checked into the Ocean Pacific Lodge for a one-night stay. On June 26, lodge staff noted extensive damage to defendant's room. Part of the flat-screen television was "melted." A desk was scratched and carved and the walls had scratches all over them. A bottle of alcohol was left in the room and there were cigarette ashes everywhere. The lodge charged defendant approximately $1,950 for the damage.

Defendant's BMW was released to him on June 26. The towing company's records indicated that E.H. drove the vehicle off the lot and paid the $696 bill. Defendant's demeanor was similar to when he first tried to pick up the vehicle, "only probably stepped up a couple notches." E.H. was shaking and looked "absolutely terrified." Defendant called E.H. names, "bark[ed] at her," and used foul language.

Also on June 26, defendant rented a room at the Dream Inn in Santa Cruz. Staff discovered the next day that the television in defendant's room had been damaged beyond repair. The television looked as though someone had punched or thrown something at it.

During the last week of June 2013, M.H.'s son, age eight or nine, was staying at E.H. and J.H.'s house. E.H. called M.H. to tell her that defendant had been outside their home and that he seemed disturbed. E.H. was afraid defendant might hurt M.H.'s son and told M.H. to come get him. That night, E.H. and J.H. locked themselves in a room with M.H.'s son. When M.H. came to get her son the next day, she picked him up in downtown Santa Cruz.

Later that week, E.H. told M.H. that defendant was still spending time outside the house, tearing things up, and throwing things in the front yard. Defendant's behavior frightened E.H.

Aki Akagi served on a church hospitality group with E.H. and had met defendant at church on three or four occasions. Akagi recalled that E.H. attended church on June 30, 2013, and was supposed to arrive at 9:30 to participate in hospitality duties. E.H. arrived late and explained that defendant had experienced "another episode" the preceding night. Defendant had been throwing outdoor furniture and other things at E.H.'s house.

Later on June 30, P.L left E.H. and J.H. a message stating that she wanted to drop by. Sometime between 4:15 and 4:30, E.H. returned P.L.'s call, leaving her a message indicating she and J.H. were home and to come over. E.H. sounded fine; there was no tension in her voice.

### 3.     The Charged Incident

E.H. called 911 from her home at 4:47 p.m. on June 30, 2013. E.H. also called defendant "in the middle of the . . . 911 call," creating a voicemail message. When combined, the recorded 911 call and the voicemail message stated the following:

911 OPERATOR:   "9-1-1 this is Gina."

MALE:                "Come on get up."

911 OPERATOR:   "What is the address of your emergency?"

MALE:                "Damn it"

5

| | |
|---|---|
| E.H.: | "Yes, I'm in Aptos and we are having a mental health emergency with my son." |

[¶] . . . [¶]

| | |
|---|---|
| E.H.: | ". . . Oh my God he just hit my husband. He hit my husband with a car! Come here quickly!" |
| 911 OPERATOR: | "Hold on" |
| E.H.: | "We need the Sheriff. . . . [H]e just ran over my husband with a car." |
| 911 OPERATOR: | "Is your husband breathing?" |
| E.H.: | "I don't know. I can't see him. I will go out there and see but send someone quickly. My son is driving away in a silver BMW, he will be having to go by the corner of Soquel [D]rive . . . ." |
| E.H.: | "Quick. He's hurting me" |

[¶] . . . [¶]

| | |
|---|---|
| E.H.: | "Oh damn you." |
| 911 OPERATOR: | "Is your husband breathing?" |
| MALE: | "Unintelligible. Bitch. Unintelligible. Fuck you. Unintelligible. Huh huh[.] We'll see. Putting an end. Putting an end. Putting an end to this bitch. Unintelligible. Ever Ever. Unintelligible. . . ." |

The 911 call disconnected. The dispatcher called back but there was no answer.

Santa Cruz County Sheriff's Deputy Casandra Galotti arrived at E.H. and J.H.'s house at 4:56 p.m. The house had a circular driveway. A blue Toyota Yaris and a silver BMW, both unoccupied and both running, were "crashed off the driveway onto the grass." Music was coming from the Toyota, which was in front of the BMW. The vehicles were close together. A black Chevy was parked in the driveway.

6

A large blanket was sprawled on the ground near the front driver's side wheel of the BMW. There were some white garbage bags and some personal items on the ground 10 to 20 feet behind the BMW.

Deputy Galotti found J.H. lying on his stomach underneath the blanket with his arms tucked underneath him. The BMW's front tire was "kind of . . . on [J.H.'s] shoulder, on his head," and his head was facing the tire. A pillow was next to the tire. J.H.'s pants were pulled down and it looked like he had been dragged or in a scuffle because he had scratches all over his body and his elbow was bleeding.

Deputy Dustin Silva arrived shortly after Deputy Galotti. As Deputy Silva approached the residence, he noticed a large pool of blood near an iron gate by the front door, blood spatter on a retaining wall, and several large pools of blood leading up the front steps. Two sandals were scattered on the steps and there were some bloody footprints. The front door was closed. Deputy Silva found E.H. lying inside the front door. E.H. had very serious injuries to her face and head. E.H.'s right arm was above her head and she had a cordless phone near her hand. Blood had pooled around her head. A pack of cigarettes was close to her knees.

Emergency responders performed life-saving measures on J.H., but he was pronounced dead at 5:00 p.m. E.H. was pronounced dead at 5:01 p.m.

Deputies searched E.H. and J.H.'s house, but did not find anyone else inside. Deputies then searched the neighborhood. Deputy Silva located a gray sweatshirt covered in blood in the hedges behind E.H. and J.H.'s residence.

At some point, a neighbor urgently gestured to Sheriff's Lieutenant Craig Wilson. Lieutenant Wilson walked in the neighbor's direction and saw defendant lying face down in a horse stable. The stable was on the property directly behind E.H. and J.H.'s house. Defendant resisted arrest, but deputies were able to handcuff him after deploying a Taser.

Defendant was dirty and disheveled. He was wearing shorts but no shirt and had only one shoe. The shoe had blood spatter on the soles. Defendant's hands were scratched

7

and bloody and he appeared to have blood on his shorts. There was blood underneath defendant's fingernails.

### 4. Neighbors' Testimony

E.H. and J.H.'s neighbor, Darryl Neubauer, heard two loud crashing sounds around 5:00 p.m. coming from E.H. and J.H.'s driveway. It sounded as though a car hit a wall or another car. Neubauer also heard people yelling loudly and a woman screaming. Seconds later Neubauer heard sirens.

Also around 5:00 p.m., another neighbor, Debbie Smith, heard what sounded like "a humongous very heavy piece of metal falling" and a loud bam. She then heard a male voice yell, "[H]elp me, help me," followed by another metal sound. Smith then heard sirens.

Neighbor Robert Hodges heard elevated voices followed by a muffled groan. Hodges then heard a metal on metal sound, like a car driving into a dumpster. Hodges looked in the direction of E.H. and J.H.'s driveway and saw a light-colored car moving. The car came to rest in the yard and someone got out and quickly walked toward the house. Hodges could only see the person from the waist down. Hodges observed that the person was African American and wore shorts and tennis shoes. Hodges next heard sirens.

Roger Pase's residence was directly behind E.H. and J.H.'s house. The two properties were separated by a fence and an unlocked gate. On the morning of June 30, 2013, Pase went to troubleshoot a shared well that was located on E.H. and J.H.'s property. Pase saw a silver BMW parked in the driveway area with its passenger door open and clothes strewn nearby. Pase heard a moan come from the car. Pase returned to the well later that morning. The BMW was still in E.H. and J.H.'s driveway area, but the passenger door was closed.

That evening, as Pase was driving home, he received a call from his mother-in-law informing him that J.H. was dead. When Pase got back to the neighborhood, he encountered sheriff's deputies by E.H. and J.H.'s house. Pase and a deputy searched Pace's home and property to make sure it was safe for Pase and his family to return. As the deputy

8

was walking back to E.H. and J.H.'s property, Pase noticed a person in a semi-fetal position who appeared to be sleeping in the horse stall area. Pase waved the deputy over.

### 5. Police Investigation

Deputy Greg Giguiere processed the crime scene. E.H. and J.H.'s property was approximately 2.34 acres and their house was 3,658 square feet. Trash, debris, and a skateboard were in the driveway area. The driveway was framed by a low border or curb.

A blue Toyota Yaris was in front of a silver BMW to the left of the residence. The Toyota was on the grass and had damage to its front left fender. The Toyota's driver's side door was open. Tree debris was on its front windshield and the passenger side of the windshield was cracked. The Toyota had "[r]ear damage . . . consistent with . . . being rear-ended."

The BMW was located beyond the driveway "into the bark and pushed into the trees," with its rear passenger side pressed up against a tree. The BMW, which was missing a front bumper, had damage to its front hood and front passenger-side fender. There were two areas of suspected blood underneath the car's front framing. Suspected blood was also found on an envelope on the driver's floorboard, the armrest of the driver's door, the driver's side molding, the steering wheel, and the gearshift. The BMW was registered to defendant.

Deputy Greg Giguiere observed that the passenger-side tires of the black Chevy parked in the driveway were flat. The air caps had been removed from the passenger-side tires and the front driver's side tire.

Deputy Giguiere located a Nike Air Jordan basketball shoe and a Sharks beanie cap in the area of the horse stall where defendant was detained. The shoe appeared to have blood on it. Deputy Giguiere found some CDs and a phone in the bushes by the property's fence line.

Deputy Giguiere found a significant amount of suspected blood near a gate in E.H. and J.H.'s front courtyard, about 30 to 40 feet from the BMW. There was also blood spatter

9

on a wall by the gate. A trail of blood drops led from the gate to the residence's front door. Deputy Giguiere recovered two earrings on the path leading up to the steps and a pair of glasses in a bush in the courtyard.

Two sandals were on the steps to the front door. The steps had suspected blood on them and several shoeprints. The suspected blood on one of the steps appeared to have been "lowered and pulled upward." It looked like something had "moved through th[e] blood" on another step toward the front door. The amount of blood on the stairs indicated that "someone had stopped and bled a lot of blood at that location, or had fallen." The front landing also had suspected blood droplets and shoeprints.

Deputy Giguiere determined that the pattern on the soles of defendant's shoes was consistent with the shoeprint pattern on the front steps. Deputy Giguiere also observed that the heel defendant's left shoe was heavily saturated with suspected blood to the level of one-third to one-half inch. Deputy Giguiere opined that the shoe made contact with E.H.'s face because there was no blood pool at the scene with that blood depth.

Sheriff's Sergeant Shon Leonetti processed the Toyota for evidence. The driver's side lower front bumper had a "dented crushed area" and the wheel well of the left front tire was damaged. The Toyota's hood had two major scratch marks, the driver's side of the vehicle had a long scrape mark, and the driver's side window was shattered. There was also significant damage to the rear of the vehicle. The hatchback was pushed in and the bumper was smashed. There appeared to be blood on the armrest, the gear shift, the center cross frame underneath the vehicle, the catalytic converter, and the undercarriage. The direction of the suspected blood on the cross frame was front to back. A strand of hair was found on the front bumper and two strands were found on the hood.

Sergeant Leonetti performed "a modified accident reconstruction" and determined that the BMW rear ended the Toyota. The passenger side of the BMW also swiped the driver's side of the Toyota.

10

California Highway Patrol Officer Anthony McFarland participated in the investigation and collision reconstruction. Officer McFarland retrieved the data from the Toyota's event data recorder; the BMW did not have an event data recorder. The retrieved data indicated that the Toyota was struck from behind twice. The collisions were approximately 16 seconds apart. The Toyota was in neutral when it was hit and the brake was not activated.

In Officer McFarland's opinion, the damage to the Toyota's front bumper was consistent with striking a soft object, such as a person. The recovery of hair strands on the bumper and the hood were consistent with the Toyota striking a person. Officer McFarland opined that it was a low-speed pedestrian crash based on the Toyota's damage. The scratches on the Toyota's hood were consistent with a person being struck by the car at a low speed and folding onto the vehicle. The damage to the undercarriage of the Toyota was consistent with a person being struck and traveling from the front to the rear of the vehicle.

DNA profiles developed from swabs of defendant's shoes and the BMW's armrest matched E.H.'s DNA profile. The DNA profile developed from blood on the Toyota's undercarriage matched J.H.'s DNA profile. The DNA profiles developed from swabs of the Toyota's gearshift and the BMW's steering wheel were mixtures of two individuals' DNA. Defendant and E.H. were possible contributors.

### 6. Subsequent Events

Forensic pathologist Dr. Venus Azar performed J.H.'s and E.H.'s autopsies on July 1, 2013. J.H. was 71 years old, six feet tall, and 280 pounds. J.H.'s scalp and face were bruised and had multiple abrasions. J.H.'s eyelids were swollen and purple and the whites of his eyes were bloodied. J.H.'s neck was bruised and had "a friction burn scrape." There was extensive blunt force trauma to J.H.'s torso, including the flattening of his chest. J.H. had numerous abrasions and bruises on his chest, back, and buttocks, and black grind deposits on his buttocks, right thigh, and lower back. Some of the scrapes were consistent with road rash. J.H.'s ribcage was crushed; his ribs had 24 fractures that were consistent

11

with being run over by a car. J.H.'s spine and pelvis were also fractured. J.H.'s upper left back and right front shoulder had red zigzag marks, consistent with tire tread. J.H.'s causes of death were blunt force trauma of the torso and mechanical asphyxiation.

E.H. was 68 years old, 5 feet 11 inches tall, and 158 pounds. E.H. had extensive bruising and scratches to her face. There was also extensive bruising and a laceration to E.H.'s scalp. All of her facial bones, including her orbital, nasal, and jaw bones, were fractured. Her mouth and sinuses were torn. E.H.'s injuries were caused by significant blunt force trauma, consistent with a high-speed car crash while not wearing a seat belt, being bludgeoned repeatedly with a hard object, or getting stomped on. E.H.'s neck was bruised and one of her neck bones was fractured on both sides, which was consistent with strangulation or a blow to the neck. E.H.'s back was scraped, which was consistent with being dragged. E.H. also had multiple contusions and abrasions to her extremities. There was hemorrhaging around E.H.'s brain and her lungs had blood in them. E.H.'s causes of death were blunt force trauma and possible strangulation.

Defendant was examined by a nurse practitioner in jail on July 1, 2013, because he was complaining of pain. Defendant would not let the nurse examine his left hand. Defendant's right hand was swollen and inflamed. He had abrasions over his knuckles and his pinky finger was crooked. Defendant was seen by the nurse again on July 3, because he was complaining of hand pain, foot pain, and a rash. Defendant's right hand was still swollen and red. When the nurse asked to see defendant's foot, he said it was fine.

Sometime during the week following the incident, defendant called M.H. Defendant told her he thought he was in jail for vandalism and asked M.H. to help him get an attorney.

B. *Defense Evidence*

Defendant testified that after E.H. and J.H. adopted him, he was "made part of the family." E.H. and J.H. "wanted to be worshipped" and wanted their children to "make them real proud" so they could have "prestige and be prominent in the community." While defendant was growing up, E.H. and J.H. encouraged competition between M.H. and

12

defendant. M.H. thought defendant threatened her position in the family and does not like him.

Defendant stated that as a child, his life revolved around J.H. His dad "was the boss" and "[t]here was no man on earth [he] was more afraid of." E.H. and J.H. were strict. When E.H. and J.H. disciplined defendant, they would yell, take things away, or beat defendant with their hands, belts, or similar objects, leaving welts on defendant's back, legs, and arms.

Defendant "got the lion's share of beatings." E.H. and J.H. would tell defendant that he was not their "real son." After one particularly brutal beating, M.H. offered to call the Sheriff, but defendant declined because J.H. had threatened him with more beatings. E.H. and J.H. were "blinded by wanting to be right" and "override [him] as their child." Defendant also "remember[ed] having to have homosexual rape encounters with [his] dad and statutory rape encounters with [his] mom to become part of the family." J.H. told him to distrust E.H. and E.H. told him to distrust J.H. Defendant tried to please his parents.

Defendant stated that his fear of J.H. continued into adulthood and he never stopped being afraid of J.H. physically harming him. If defendant did something wrong, J.H. would threaten to kill him or "beat his ass." When defendant committed crimes, he would receive "double punishment" from the law and J.H. "[T]hey would beat [him]," leaving "internal wounds."

Defendant testified that in 2013, he was looking for a place to live and sometimes stayed with E.H. and J.H. or in motel rooms. Defendant could visit E.H. and J.H. any time; there were no restrictions. Sometimes E.H. and J.H. let him stay at their house and sometimes they would ask him to leave but he was never unwelcome.

Defendant stated that the week before E.H.'s and J.H.'s deaths, his BMW was parked at E.H. and J.H.'s house. Defendant was trying to repair the BMW after someone hit him.

13

The hood and front quarter panel were damaged. Defendant rented a blue Toyota Yaris to use during that time.

On June 28, defendant was in the process of moving property from one car to the other and throwing trash away at E.H. and J.H.'s residence. Defendant fell asleep inside the house, but J.H. woke him up and told him to leave because he did not want him to spend the night. Defendant left before he could finish cleaning up. His belongings and trash were still there on June 30.

Defendant testified that he got to E.H. and J.H.'s house around 4:00 or 5:00 o'clock on June 30. Defendant was in a hurry to visit E.H. because it was "church day." He went to church with E.H. almost every weekend. His BMW was still parked at the house. He drove the Toyota to get there and parked it in front of the BMW on the left side of the driveway in a little parking area.

Defendant stated that when he arrived at the house, he heard J.H. yelling and E.H. screaming. Defendant looked through the front door window and saw J.H. hitting E.H. from behind. J.H. was "too big to fight" so defendant "tried to distract him by letting air out of his tires so he'd say, hey, what are you doing, get away from my car." J.H. was 6'4" tall and was heavy set. He had the build of a football player.

E.H. came outside and asked what defendant was doing. Defendant explained that he was trying to distract them from fighting. E.H. told defendant that she did not think J.H. wanted him to let the air out of his tires and went back inside. Defendant stayed outside.

Defendant walked over to the Toyota. As defendant leaned over the car trying to decide what to do, J.H. charged at him with a frightening look on his face and his fists balled. Defendant feared for his life and tried to leave because he did not want to fight J.H. and he did not want J.H. to hurt him. Defendant got into the Toyota and rolled the window up. J.H. told defendant to roll down the window because he wanted to talk to him. J.H. then leaned over defendant and punched him in the face. J.H. grabbed defendant tightly

14

around the throat, shook him, and said, "I should break your Goddamn neck." Defendant pushed J.H. away, rolled the window back up, and started to back up the car.

Defendant testified that as he was backing up the Toyota while trying to avoid J.H. and the BMW, J.H. "had gotten around behind [him]." Defendant accidentally backed into J.H., trapping J.H. under the rear of the car. In an effort to save J.H., defendant got into the BMW and "rammed forward to hit the [Toyota] off of him." The Toyota came to rest past a tree. J.H.'s head and shoulder were then underneath the front of the BMW. Defendant did not intend to drive the BWM over J.H. Defendant thought that J.H. was still alive, so he put a blanket on him, elevated his head with a pillow, and headed to the house to call 911.

Defendant stated that E.H. came outside with her dog and attacked him by the gate near the front door. E.H. was calling 911 "trying to get more people to come after [him]." E.H. was hysterical and was making flailing motions, which scared defendant. Defendant thought E.H. was going to hit him with the cordless phone or stab him with the phone's chrome antennae. The dog was biting defendant and E.H. was yelling and swinging at him.

Defendant swung back at E.H. to stop her because he did not want to be hurt or killed. All of his spankings had been inside the house; "they had never c[o]me out after [him] or brought the dogs after [him]." His instinct to defend himself "took over." Defendant "hit [E.H.] until she fell back." Defendant did not recall how many times he hit her. Defendant did not use his foot to stomp on E.H. or kick her.

Defendant testified that E.H. hit her head on the ground when she fell. E.H. was not moving. Defendant tried to wake her up, but E.H. was unresponsive. Defendant picked E.H. up by her armpits and dragged her into the house because he did not want to see her "laying out there in the street." As defendant was taking E.H. into the house, E.H. fell out of his hands onto the front steps. Defendant picked her up again to get her inside.

Defendant had intended to put E.H. on the couch but laid her on the ground instead when he heard sirens. "[S]omething was saying . . . get out of there before you get shot. And so, [he] tried to get outta there." Defendant "ran away because [he] was afraid that [he]

15

was gonna be hurt" or accidentally shot by the police. Defendant "went behind the house . . . and passed out in [his] neighbor's yard in the horse corral." He wanted to stay close to have a witness nearby so that law enforcement would not accidentally shoot him. Defendant "felt like [E.H. and J.H.] were going out of their way to try to hurt [him]" and "felt terrorized that [he] was gonna be shot." Defendant did not go back to his cars after he took E.H. inside the house and did not know how blood got inside the cars. Defendant was not under the influence of drugs or alcohol.

Defendant's "fears were realized, because, when the cops got there, they pointed their guns at [him]." Defendant was in shock. Defendant did not resist arrest. His muscles froze up and he was unable to move.

Defendant stated that E.H. and J.H. "would still be alive if they hadn't attacked [him]." It was not his intention to kill his parents. Defendant denied that when he struck E.H. he called her "a bitch" or told her "she got what's coming to her." Defendant may have said, "[L]eave me alone or get away from me." Defendant had not threatened to kill his parents in the past or take their house from them. Defendant had not been outside the house a couple nights before June 30 threatening E.H. and J.H. with an ax.

Defendant denied that he was threatening toward E.H. or that he called her "a bitch" when she helped him get his car from the tow lot. Defendant felt that the person at the tow company was rude to him. Defendant's frustration may have been misinterpreted as anger.

Defendant did not ask the car rental agent what would happen if he hit a pedestrian with a rental car. Because defendant's vehicle had recently been in an accident, he asked whether he would be fully covered by the rental insurance. He was not planning to hit anyone with a car.

Defendant stated that the television in his room at the Dream Inn was damaged when he was playing football in the room with one of his friends. Defendant admitted that he "probably did some damage in [his] room" at the Ocean Pacific Lodge. Defendant thought

that the hotel manager and employees were being rude and "playing games," such as making prank calls or knocking on the door and running away before he answered.

Defendant testified that J.H. had threatened his life and pointed guns at him while defendant was an adult. Since the age of 12, defendant told people that he was being physically and sexually abused, but no one reported it. People are "either denying it or . . . lying about it."

Defendant stated that he talked to M.H. once after E.H. and J.H. died. Defendant explained to M.H. what happened with E.H.'s and J.H.'s deaths. When M.H. testified that during a jail call defendant had spoken to her about committing a vandalism, M.H. was confusing another incident.

Defendant testified that he was unfamiliar with E.H. and J.H.'s finances but he knew there was a college trust fund. He was supposed to get the trust money when he turned 18, but then he had to wait until he was 21. Defendant lost track of the trust after he turned 21. Defendant stated that he received a letter after E.H.'s and J.H.'s deaths stating that he was a beneficiary of the trust. He recently learned that he may be entitled to up to $1 million dollars.

Lorraine Goodwin testified that she knew defendant and E.H. from church. Goodwin did not see defendant at church every Sunday, but she saw him often enough to know who he was. Defendant sat apart from E.H. and sometimes stared in her direction. When Goodwin spoke to defendant, defendant's demeanor was "[w]ithdrawn [and] spaced out." Defendant and E.H. were at church the day E.H. died. Goodwin saw defendant staring in E.H.'s direction. Defendant's demeanor was the same.

C.     *Rebuttal Evidence*

On July 6, 2013, defendant called M.H. from jail. The recorded call was played for the jury. Defendant was recorded telling M.H., "I think they're gone." M.H. asked what defendant was talking about. Defendant repeated M.H.'s question back to her in response. Defendant stated that he was calling M.H. because she was his sister and he did not have

17

anyone else to turn to. Defendant said, "[W]hen I called to talk to [E.H.] . . . sometimes talking to her doesn't help when I'm angry and I'm calling to talk to [J.H.] and [J.H.] doesn't want to talk to me 'cause he thinks I'm trying to . . . take over his house or . . . he's still mad at me for something I did 10, 20 or 30 years ago." Defendant asked M.H. to put money on his jail books and to help him get an attorney. Defendant stated that he "was put in jail for vandalism again" and that he "think[s] it was a room."

On July 16, 2013, defendant was recorded on a jail call to an unidentified man stating, "My - my family is dead, and they're accusin' me of killin' 'em. I caught my dad beatin' my mom's ass, and I jumped in and the fucker tried to . . . beat my ass too. Then I . . . was like 'Fuck that.' I'm not fightin' with him, and I tried to leave, and no - he wouldn't . . . let me leave, so I ran his punk ass over. That's it. . . ."

### D. *Charges, Verdicts, and Sentence*

Defendant was charged with two counts of murder (§ 187, subd. (a); counts 1-2). A multiple murder special circumstance was alleged (§ 190.2, subd. (a)(3)) and it was also alleged regarding count 1 that defendant used a deadly weapon, a car, in the commission of the offense (§ 12022, subd. (b)). It was further alleged that defendant had a prior strike conviction (§ 667, subds. (b)-(i)) and had served five prior prison terms (§ 667.5, subd. (b)).

A jury found defendant guilty of two counts of first degree murder and found true the special circumstance allegation. At the conclusion of a sanity trial, the jury found defendant was sane when he committed the murders.

The trial court sentenced defendant to two consecutive terms of life without the possibility of parole, imposed various fines and fees, and ordered restitution. Without objection, the court struck the deadly weapon, prior strike, and prior prison term allegations.[3]

---

[3] The court observed at sentencing that there was no finding regarding the deadly weapon allegation. It appears that the deadly weapon allegation was not submitted to the jury for decision.

### III.    DISCUSSION

**A.    *Pinpoint Instruction on Imperfect Self-Defense***

Defendant contends the trial court erred when it gave a pinpoint instruction at the prosecution's request that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance."  Relying on *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*) and *People v. Ocegueda* (2016) 247 Cal.App.4th 1393 (*Ocegueda*), defendant argues that the instruction "improperly prevented the jury from considering [his] mental disturbance in determining whether he killed [his] parents in imperfect self-defense."  The Attorney General counters that the instruction correctly stated the law and there is no reasonable likelihood that the jury misunderstood the instruction.

**1.    Trial Court Proceedings**

The trial court instructed the jury on voluntary manslaughter committed in imperfect self-defense with CALCRIM No. 571.  The instruction stated:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.  If you conclude that the defendant acted in complete self-defense, his action was lawful, and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if, number one, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and number two, the defendant actually believed that the immediate use of deadly force was necessary to defend against that danger; but number three, at least one of those beliefs was unreasonable.  Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed.  The danger must seem immediate and present, so that it must be instantly dealt with.  It may not be merely prospective or in the near future.  Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"[¶] . . . [¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of murder."

Immediately after instructing the jury with CALCRIM No. 571, the trial court gave the jury the following pinpoint instruction:  "Imperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance."

After instructions concluded, defendant noted his objection to the pinpoint instruction.[4]  The trial court responded that "th[e] language was consistent with the Elmore opinion, was consistent with the status of the case law at this point."  The prosecution added that "both the [c]ourt and counsel worked on that language to come directly out of Elmore."  At the court's request, the prosecution elaborated:  "The People had initially requested this court to force [defense counsel] to choose whether he was going to argue that [defendant] was under an actual belief, or whether they were, in fact, delusions.  Under People v. Elmore, the decision says, when the action is based on delusions alone, that that is an issue to determine in the sanity phase.  [¶]  And I thought that, with regards to part of the testimony, [defense counsel] was going to be arguing at the sanity phase that the incidents were based on delusion, that he should be prohibited from arguing that there was objective

_____

[4]  Defendant stated, "There was the added language for the involuntary manslaughter [instruction] that was from the Elmore case.  It was given as a special instruction.  We had a conversation off the record about that.  I just wanted my objection to the additional language noted."

20

or actual facts to support the imperfect self-defense here. [¶] When the [c]ourt had indicated that he was going to allow the imperfect self-defense, the People had then requested the language regarding imperfect self-defense and actual belief being based on objective circumstances and not mental disturbance alone to be sufficient to ease the People's concerns."

### 2. Standard of Review

There is no sua sponte duty to instruct a jury " 'on the actual effect of the defendant's mental disease or disorder on his relevant mental state.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58.) However, "once a trial court undertakes to instruct on a legal point, it must do so correctly." (*Ibid.*)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) " 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation. [Citation.] "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 544 (*Nelson*).)

### 3. Analysis

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "A killing committed because of an unreasonable belief in the need for self-defense is voluntary manslaughter, not murder. 'Unreasonable self-defense, also called imperfect self-defense, "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." [Citation.]' [Citation.]" (*Elmore*, *supra*, 59 Cal.4th at pp. 129-130.)

21

Under the doctrine of imperfect self-defense, "defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness." (*Elmore*, *supra*, 59 Cal.4th at p. 146; see also § 28, subd. (a) ["[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged"].) However, imperfect self-defense does not apply "when belief in the need to defend oneself is *entirely* delusional." (*Elmore*, *supra*, at p. 130, italics added.) Imperfect self-defense "involves a mistake of *fact*," whereas "[a] purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity. . . . At a trial on the question of guilt, the defendant may not claim [imperfect] self-defense based on insane delusion." (*Ibid.*)

Here, after giving the pattern instruction on voluntary manslaughter committed in imperfect self-defense, the trial court instructed the jury that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance." Based on the principles articulated by the California Supreme Court in *Elmore*, we conclude that the pinpoint instruction was not an incorrect statement of the law.

As *Elmore* explains, imperfect self-defense "entails a reaction that is ' " 'caused by the circumstances.' " ' " (*Elmore*, *supra*, 59 Cal.4th at p. 138.) "A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate." (*Id.* at p. 137.) The trial court's pinpoint instruction articulated those principles by first stating that "[i]mperfect self-defense involves a misperception of objective circumstances" and then stating that imperfect self-defense does "not [involve] a reaction *produced* by mental disturbance." (Italics added.)

To the extent the pinpoint instruction was ambiguous because it did not explicitly state that imperfect self-defense does not involve an act caused by "cognitive defects *alone*"

22

(*Elmore*, *supra*, 59 Cal.4th at p. 136, italics added), we determine there is no " ' "reasonable likelihood the jury misunderstood and misapplied the instruction" ' " (*Nelson*, *supra*, 1 Cal.5th at p. 544). As stated, the trial court gave the pinpoint instruction immediately after it instructed the jury with CALCRIM No. 571, the pattern instruction on voluntary manslaughter committed in imperfect self-defense. The pattern instruction told the jury that "[i]n evaluating the defendant's beliefs, [it was to] consider *all* the circumstances as they were known *and appeared to the defendant*." (Italics added.) The instruction also stated that "[a] danger is imminent if, when the fatal wound occurred, the danger actually existed or *the defendant believed it existed*." (Italics added.) Thus, the pattern instruction informed the jury that it was to evaluate whether defendant killed in imperfect self-defense by considering all the circumstances from defendant's perspective. (See *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 745 [CALCRIM No. 571 instructs a jury "to evaluate [the] defendant's belief in the need to use lethal force *from his perspective*"].) Given that language in the pattern instruction, we conclude it is not reasonably likely the jury would have disregarded evidence of defendant's "mental disease, mental defect, or mental disorder" in determining whether defendant acted in imperfect self-defense based on his misperception of the objective circumstances. (§ 28, subd. (a); see *Elmore*, *supra*, 59 Cal.4th at p. 146 ["the defense [may] present[] evidence of mental disease, defect, or disorder to support a claim of unreasonable self-defense based on a mistake of fact"].)

Defendant relies on this court's decision in *Ocegueda* to argue that the pinpoint instruction "improperly limited the jury's consideration of . . . defendant's mental disabilities," but we find *Ocegueda* inapposite. In *Ocegueda*, the trial court instructed the jury that it could consider evidence of the defendant's mental disorder " 'only for the limited purpose of deciding whether, at the time of the charged crimes and special allegations, the defendant acted or failed to act with . . . [t]he intent to kill contained in attempted murder and attempted voluntary manslaughter [and] [t]he premeditation and deliberation contained

23

in the special allegation relating to the charge of attempted murder.' " (*Ocegueda*, *supra*, 247 Cal.App.4th at p. 1405, fn. omitted.) This court held that in contravention of section 28, subdivision (a), the pinpoint instruction erroneously "limit[ed] the jury's consideration of mental disability evidence to the question of whether [the] defendant had an intent to kill," thereby precluding the jury's consideration of the mental disability evidence in its determination of "whether [the defendant] harbored express malice." (*Ocegueda*, *supra*, 247 Cal.App.4th at p. 1407.)

Unlike in *Ocegueda*, the pinpoint instruction here stated that "[i]mperfect self-defense involves a misperception of objective circumstances" rather than "a reaction produced by mental disturbance." It did not explicitly limit the jury's consideration of mental disability evidence to certain mental states. (Cf. *Ocegueda*, *supra*, 247 Cal.App.4th at p. 1409 ["the erroneous instruction explicitly limited the jury's consideration of mental disabilities to the issue of whether he intended to kill"].)

For these reasons, we conclude that defendant has not established that the trial court erred when it gave the pinpoint instruction that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance."

### 4.   Even Assuming Error, the Pinpoint Instruction Was Harmless

Even if we were to assume that the trial court erred when it gave the pinpoint instruction stating that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance," we would find the error harmless.

"An instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense, violates the defendant's rights under both the United States and California Constitutions, and is subject to *Chapman* review.[5]

---

[5] *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

24

[Citations.] . . . In contrast, 'misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*.'[6] [Citations.]" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830 (*Larsen*).)

The pinpoint instruction at issue here—that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance"— was not a misstatement of an element of an offense, nor did it remove an element from the jury's consideration. "Rather, it [was] a pinpoint instruction relating particular facts to a legal issue in the case." (*Larsen*, *supra*, 205 Cal.App.4th at p. 830.) Thus, prejudice is evaluated under *Watson*'s harmless error standard. (See *Larsen*, *supra*, at pp. 829-831 [analyzing under *Watson* the prejudicial effect of a trial court's failure to instruct on mental impairment as a defense to the formation of specific intent or requisite mental state]; see also *Ocegueda*, *supra*, 247 Cal.App.4th at p. 1410 [analyzing under *Watson* the prejudice from an instruction limiting the jury's consideration of mental disorder evidence to whether defendant harbored an intent to kill].)[7]

Under *Watson*, we assess whether it is "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there

---

[6] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

[7] For the reasons stated, we do not agree with the parties that prejudice must be evaluated under *Chapman*'s standard, which mandates reversal unless the error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.) However, even under *Chapman*'s standard, we would find the assumed instructional error harmless based on the record before us.

is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

Here, the evidence established that defendant first killed J.H. by running him over with a car and then killed E.H. by inflicting blunt force trauma on her. During a 911 call, E.H. placed defendant at the scene, stated that defendant had run over J.H., and stated that defendant was in the process of hurting her. Defendant was found by a Sheriff's deputy on a neighboring property. J.H's blood was located on the undercarriage of a blue Toyota, the car defendant had rented six days before the incident. E.H.'s blood was found inside defendant's BMW and on the soles of defendant's shoes.

Defendant did not contest that he killed J.H. and E.H. Defendant testified that after J.H. punched him through the Toyota's window, he accidentally backed over J.H. when he was trying to leave, trapping J.H. under the car.[8] Defendant stated that he then tried to ram the Toyota off of J.H. by hitting it with the BMW, inadvertently causing J.H.'s head and shoulder to be lodged underneath the BMW's front tire. However, the forensic evidence was consistent with J.H. being struck by the front of the Toyota and traveling underneath the car from front to back. In addition, a car rental agent testified that when defendant rented the Toyota, defendant inquired whether he would be covered by rental insurance if he hit a pedestrian, a question the agent had never been asked before despite having rented "thousands of cars" and which belied defendant's claim of accident. Defendant was later recorded on a jail call stating that when J.H. would not let him leave, defendant "ran his punk ass over."

Defendant testified that he killed E.H. because he feared for his life when she was hysterically flailing her arms with a cordless telephone. Defendant stated that his instinct to defend himself "took over" and he "hit [E.H.] until she fell back." Defendant denied stomping on E.H. However, forensic evidence established that E.H.'s injuries, which

_____

[8] Defendant testified that he tried to avoid J.H. while he was backing up and that he did not hit him on purpose. Defendant characterized it as an "accident."

26

included the fracture of all her facial bones, were consistent with a high-speed car crash while not wearing a seat belt, being bludgeoned repeatedly with a hard object, or getting stomped on. One of E.H. neck bones was also fractured, which led the autopsy surgeon to opine that E.H. may have been strangled as well. Further, defendant was recorded stating "[f]uck you" and "[p]utting an end to this bitch" while E.H. called 911, which is strong circumstantial evidence that defendant harbored malice when he killed E.H. and did not act in perfect or imperfect self-defense. There was also evidence that defendant had threatened to kill E.H. and J.H. in the past and that he may have had a monetary motive for the killings.

For these reasons, based on the strength of the evidence that defendant acted with malice aforethought when he killed J.H. and E.H., we conclude it is not " 'reasonably probable' " that defendant would have obtained a more favorable trial result absent the pinpoint instruction that "[i]mperfect self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance." (See *Beltran*, *supra*, 56 Cal.4th at pp. 955-956.)

## B. *Exclusion of Deceased Witness's Statements*

Defendant contends the trial court abused its discretion when it excluded the statements of a deceased witness, Charles Weeks. The Attorney General counters that the court properly excluded the statements as unreliable hearsay that lacked probative value and because the statements were potentially confusing.

### 1. Trial Court Proceedings

Defendant moved in limine to introduce Charles Weeks's statements. At some point before trial, Weeks told a defense investigator before his death that he knew J.H. and had witnessed him intimidate, demean, and threaten defendant on several occasions. Weeks stated that defendant appeared to be afraid of J.H. Defendant argued that Weeks's statements were "clearly exculpatory" and "reliable because [they were] given by an

27

uninvolved[] person with no interest in the outcome." Defendant asserted that the statements must be allowed into evidence to guarantee his fair trial rights.

During a hearing on the in limine motions, the prosecution objected to the statements' admission on hearsay grounds. Defendant argued that although the statements were hearsay, his constitutional due process and fair trial rights compelled the evidence's admission. The trial court denied the motion without prejudice.

The trial court revisited the issue during trial. Defendant explained that according to a defense investigation report, Weeks and defendant lived together for approximately six months in 2000. During that time, Weeks met J.H. on several occasions and observed J.H. "treat [defendant] in an angry and degrading way, calling him, quote, a piece of shit." J.H. was "overpowering and intimidating" and defendant became withdrawn around him. Weeks "always thought there was a possibility that [J.H.] would become angry and, quote, kick both our asses." The report stated that "[o]n one occasion, [J.H.] made an unexpected visit to the apartment . . . . [J.H.] was banging on the door angrily, demanding that they let him in. [Defendant's] response was to indicate to Mr. Weeks that he wanted him to be quiet, pretend they weren't there. Mr. Weeks was afraid that [J.H.] might break the door down."

Defendant argued that Weeks's statements were admissible under *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) because "under certain circumstances, it [i]s a denial of due process to mechanically apply state hearsay rules when it prevent[s] admission of material and exculpatory information." The court tentatively excluded the statements as too remote in time, possessing minimal or no probative value, and potentially confusing to the jury. The court stated that it would make its final determination on the admissibility of Weeks's statements after hearing defendant's testimony.

After defendant testified, defendant argued that Weeks's statements were relevant to explain defendant's actions during the incident because the statements demonstrated that defendant was intimidated by and afraid of his father. The trial court ruled that Weeks's

statements were inadmissible under Evidence Code section 352 because they were "too remote to be probative," "speculative in nature," and "potentially . . . confusing."

### 2. Standard of Review

"Evidence may be excluded under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'[9] An exercise of discretion under Evidence Code section 352 will be affirmed unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice. [Citation.]" (*People v. Winbush* (2017) 2 Cal.5th 402, 469 (*Winbush*).)

### 3. Analysis

Relying primarily on *Chambers*, defendant contends the trial court abused its discretion when it excluded Weeks's statements because the statements were "highly relevant" to defendant's belief in the need to defendant himself against J.H. and the statements constituted reliable evidence critical to his defense.

" 'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense. In *Chambers* . . . , it was held that the exclusion of evidence, vital to a defendant's defense, constituted a denial of a fair trial in violation of constitutional due process requirements.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) However, a defendant does not have "a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value." (*Ibid.*) Rather, such evidence may be properly excluded under Evidence Code section 352. (*Ibid.*; see also *Crane v. Kentucky* (1986) 476 U.S. 683, 689

---

[9] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[recognizing a trial court's ' "wide latitude" ' in making ordinary evidentiary rulings].) While "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense" (*Chambers*, *supra*, 410 U.S. at p. 302), "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence" (*ibid.*).

Here, we conclude that the trial court did not abuse its discretion or violate defendant's constitutional rights when it denied the admission of Weeks's statements under Evidence Code section 352 because the statements were remote and speculative. As the trial court determined, Weeks's statements were of limited probative value because they pertained to Weeks's observations of defendant and J.H.'s interactions long before (13 years) the charged incident. Moreover, Weeks's statements that he "always thought there was a possibility that [J.H.] would become angry and, quote, kick both our asses" and that on one occasion Weeks "was afraid that [J.H.] might break the door down" were speculative. In addition, the statements' probative value to defendant's claim of self-defense was further limited by the fact that they did not include the observation of any violence against defendant by J.H. For these reasons, the trial court's exclusion of the evidence was neither "arbitrary, capricious, or patently absurd." (*Winbush*, *supra*, 2 Cal.5th at p. 469.)

Defendant contends that Weeks's statements should have been admitted despite their hearsay nature because they bore "persuasive assurances of trustworthiness and [were] critical [to his] defense." However, the trial court did not preclude the statements' admission because they were hearsay; it barred the statements under Evidence Code section 352, stating that it had "performed a 352 analysis." And, as explained above, the statements lacked significant probative value and were speculative, leading us to conclude that the statements' admission was not critical to defendant's case. In contrast, the excluded evidence determined to be "critical" in *Chambers* involved the sworn, but later repudiated,

30

confession of someone other than the defendant to the charged crime of killing a police officer and the testimony of three witnesses to whom that person had also confessed. (*Chambers*, *supra*, 410 U.S. at pp. 288, 291-292, 302.)  "[B]oth [the California Supreme Court] [citation] and the United States Supreme Court [citation] have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered." (*People v. Ayala* (2000) 23 Cal.4th 225, 269.)

We therefore determine that the trial court did not abuse its discretion or violate defendant's constitutional rights when it excluded the deceased witness's statements under Evidence Code section 352.

### C.     *Evidence of the Family Trust Fund*

Defendant contends the trial court erred when it admitted evidence elicited during his cross-examination that he was the beneficiary of up to $1 million in trust money.  Defendant argues that the evidence was irrelevant because the prosecution did not establish that he was aware of the trust before he killed E.H. and J.H.  Defendant asserts that the evidence's admission violated his due process right to a fair trial.  The Attorney General counters that the trial court did not abuse its discretion or violate defendant's constitutional rights when it admitted the evidence because there were permissible inferences to be taken from it.

### 1.     **Trial Court Proceedings**

The prosecution moved in limine to introduce evidence of E.H. and J.H.'s family trust during defendant's cross-examination.  The prosecution asserted that the trust entitled defendant to up to $1 million for his health, education, maintenance, and support.  The prosecution alleged that M.H. had petitioned to remove defendant as a trust beneficiary because defendant "intentionally and feloniously caused the death of [E.H.] and [J.H.]" and that defendant filed a counterclaim asserting that he was "entitled to the money because he did not intentionally kill them and their death was a result of self-defense."

At the hearing on the in limine motion, defendant argued that the trust evidence should be excluded because there was no evidence that defendant was aware of the money

31

he would receive on his parents' death. The prosecution responded that if defendant claimed self-defense, the existence of the trust was "a motivation for [defendant] to assert some sort of unintentional killing." The prosecution also argued that "if motive becomes an issue," defendant's knowledge of the trust money was evidence of defendant's motive to kill E.H. and J.H. The trial court ruled "that evidence of the trust would be considered by this court as probative, if indeed self-defense is alleged."

During cross-examination, the following exchanged occurred:

"[THE PROSECUTION]: Are you aware of a trust that your parents had established in the event of their death?

"[DEFENDANT]: There's a funny thing about that trust. The trust that I understand was college money that was set aside when I was adopted. And then, later on, that changed, and it went from turning 18, and I didn't get it when I was 18, so I had to wait until I was 21. And then, after I turned 21, I lost track of it. I didn't know about it and didn't find out until recently, after my mom and dad's death. And I was given a letter, and the letter said that I was a beneficiary in the trust. I found out about the trust again. But I didn't know about it. And those records can be checked too by Chen, Primose and Lee (phonetic). And I don't have any contact with them since after 2013.

"[THE PROSECUTION]: And did you learn, as part of the trust, that you could be entitled to up to a million dollars?

"[DEFENDANT]: I didn't know that until recently. [¶] . . . [¶] And I certainly would not have predeceased [*sic*] [J.H.] and [E.H.] knowing about that trust that I wouldn't receive any trust fund if [J.H.] and [E.H.] were predeceased [*sic*].

"[THE PROSECUTION]: And you had filed motions in Probate Court wanting to say that this was an unintentional killing and that you're entitled to your money, right?

"[DEFENDANT]: Right.

"[THE PROSECUTION]: And you're saying you never would have killed [J.H.] and [E.H.] to get any money?

32

"[DEFENDANT]:  No."

### 2.    Standard of Review

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."  (*People v. Waidla* (2000) 22 Cal.4th 690, 723.)  "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citation.]"  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

### 3.    Analysis

We determine that the trial court did not abuse its discretion when it allowed the prosecution to cross-examine defendant regarding his knowledge of his trust fund benefits.

Generally, "all relevant evidence is admissible."  (Evid. Code, § 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  Relevant evidence " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent or motive.' "  (*People v. Champion* (1995) 9 Cal.4th 879, 922 (*Champion*), overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.)

Here, the evidence that defendant knew he stood to inherit money through the trust " 'tend[ed] logically, naturally, and by reasonable inference' " to prove that defendant had a motive to kill E.H. and J.H. and to disprove that he acted in self-defense.  (*Champion*, *supra*, 9 Cal.4th at p. 922.)  Motive "is defined as a '[c]ause or reason that moves the will and induces the action[,]' '[a]n inducement, or that which leads or tempts the mind to indulge a criminal act.' "  (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017.)  "Although motive is normally not an element of any crime that the prosecutor must prove, 'evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.' "   (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, overruled on

another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)  Further, it was the prosecution's burden to prove that defendant did not act in self-defense.  (See *People v. Rios* (2000) 23 Cal.4th 450, 461-462 [prosecution must disprove self-defense to prove malice for murder].)  The evidence of the trust money logically tended to prove defendant's motive and intent to kill, thereby negating his claim of self-defense.

While defendant argues that the evidence was not relevant because the prosecution did not establish that he knew of the trust money before the killings, defendant testified that "[t]he trust . . . was college money that was set aside when [he] was adopted" and that when he did not receive the money at age 18 or 21, he "lost track of it."  A reasonable inference from this testimony is that defendant was aware of the "college money" in the trust when he killed E.H. and J.H.  When asked whether he "learned, as part of the trust, that [he] could be entitled to up to a million dollars," defendant testified that he "didn't know that until recently" and that he did not kill E.H. and J.H. for the money.  It was up to the jury to assess defendant's credibility on that point.

Defendant further contends that the admission of the evidence violated his right to due process under the federal constitution.  However, since we have not found that the admission of defendant's cross-examination testimony regarding the family trust was error under state law, we need not decide "the consequences of that error, including . . . whether the error was so serious as to violate due process."  (*People v. Partida* (2005) 37 Cal.4th 428, 437 (*Partida*).)

For these reasons, we conclude that the trial court did not abuse its discretion when it admitted evidence of defendant's benefits under the family trust.

**D.**     ***Evidence of Defendant's Church Attendance and Religious Understanding***

Defendant contends the trial court abused its discretion when it allowed the prosecution to question him "about religious beliefs."  Defendant observes that Evidence

34

Code section 789 bars evidence of a witness's religious beliefs to attack or support the witness's credibility and argues that the evidence admitted at trial was not relevant.[10]

### 1. Trial Court Proceedings

Defendant testified on direct examination that he attended church with his mother "[u]sually every weekend." On cross-examination, the prosecution asked defendant whether on the day of the incident he was "planning on just coming in and going to lunch with [his] mom." Defendant responded that he knew he "wouldn't be making it to church, but [he] was there to at least visit [his] mom on church Sunday." Through further questioning, defendant stated that he and E.H. had begun to attend church together and that he had attended E.H.'s baptism shortly before her death. The following exchange then occurred:

"[THE PROSECUTION]: And when you go to church, would you read the Bible?

"[DEFENDANT]: A little.

"[THE PROSECUTION]: You start to understand the Commandments?

"[DEFENDANT]: I don't know about that part, but I've listened . . . .

"[THE PROSECUTION]: You would start to hear as they talked sometimes about being a good person and making yourself a better person and the role that Christ can play in your life, right?

"[DEFENSE COUNSEL]: Object as to relevance, undue consumption of time.

---

[10] Defendant also asserts that the questioning constituted prosecutorial misconduct, but that "there is nothing to gain on this appeal from seeking relief on the basis of prosecutorial misconduct apart from the trial court's error in allowing such questioning." Because defendant does not seek relief on the basis of prosecutorial misconduct, we solely address defendant's claim that the trial court abused its discretion in its admission of the religion evidence.

In addition, defendant alternatively contends that if this court determines his claim was not preserved for review based on his trial counsel's failure to object to the evidence under Evidence Code section 789, his trial counsel rendered ineffective assistance. Because the Attorney General does not assert that the claim was forfeited, we address the claim on its merits, which forecloses defendant's ineffective assistance of counsel claim.

"THE COURT:  I'll overrule, allow a little leeway in this area.  [Defendant], do you have the question in mind?

"[DEFENDANT]:  What I understand from going to Santa Cruz Hope is that Danny, he talked about his kids a lot, he talked about being saved, he talked about the importance of religion and the importance of being together.  I don't remember specific scripture.  I don't remember specific Commandments.

"[THE PROSECUTION]:  And those were things --

"[DEFENDANT]:  It's possible he talked about that.

"[THE PROSECUTION]:  And those were things that became important to your mother, right, the stuff that she was learning at church?

"[DEFENDANT]:  Well, I don't know how important it was to her.  I think that she went to church because she had friends there. . . ."

### 2.    Analysis

Evidence Code section 789 provides:  "Evidence of his [or her] religious belief or lack thereof is inadmissible to attack or support the credibility of a witness."  In other words, a witness's credibility may not be attacked or supported "*on the basis of* his or her religious beliefs" or lack thereof.  (*People v. Bautista* (2008) 163 Cal.App.4th 762, 785, italics added; see also *People v. Cook* (1983) 141 Cal.App.3d 224, 326 [finding no violation of Evidence Code section 789 because the evidence at issue "was not admitted for the purpose of attacking [the witness's] credibility *because of* his religious views" (italics added)].)

Based on our review of the record, we do not discern an attempt by the prosecution to attack defendant's credibility *on the basis* of his religious beliefs.  Defendant was neither asked his religious beliefs, nor did he offer them.  Rather, after defendant testified on direct examination that he attended church with E.H. "[u]sually every weekend," defendant was asked on cross-examination whether he read the Bible in church, whether he "start[ed] to understand the Commandments," and whether he "start[ed] to hear as they talked sometimes about being a good person and making yourself a better person and the role that Christ can

36

play." Defendant responded that he read the Bible "[a] little" and that he heard someone at church "talk[] about his kids a lot, . . . talk[] about being saved, [and] talk[] about the importance of religion and the importance of being together." Defendant stated that he did not "remember specific scripture" or "specific Commandments." Defendant was also asked whether "those were things that became important to [E.H.], . . . the stuff that she was learning at church." Defendant responded that he did not know how important those things were to her and that he thought "she went to church because she had friends there." Moreover, the prosecution did not discuss defendant's religious beliefs during argument or otherwise attack defendant's credibility *on the basis of* his religious beliefs. Accordingly, the questioning did not run afoul of Evidence Code section 789.

Defendant argues that the evidence "was [not] remotely relevant." As stated, however, defendant testified on direct examination that he attended church with E.H. "[u]sually every weekend." The prosecution's questions are fairly read as attempting to impeach that testimony, as the questions inquired into what defendant had learned from his church attendance and the importance of the church's teachings to E.H. "The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. [Citation.]" (*People v. Chatham* (2006) 38 Cal.4th 344, 383.) The trial court did not abuse its " 'wide discretion in controlling the scope of relevant cross-examination' " when it allowed the prosecution to briefly question defendant about what he understood from his church attendance because the questioning bore on the veracity of defendant's testimony on direct examination. (*People v. Lancaster* (2007) 41 Cal.4th 50, 102.)

Defendant further contends that the questioning violated the due process clause because it rendered the trial fundamentally unfair. However, since we have not found that

37

the admission of evidence constituted error under state law, we need not decide "the consequences of that error, including . . . whether the error was so serious as to violate due process." (*Partida, supra*, 37 Cal.4th at p. 437.) Moreover, defendant acknowledges that, "[t]aken in isolation, the questioning . . . about religious beliefs likely did not make a difference in the outcome of [his] trial."

For these reasons, we reject defendant's claim that the trial court abused its discretion when it permitted the prosecution to cross-examine defendant about what he learned from his church attendance with E.H.

### E. *Cumulative Prejudice*

Defendant contends that his convictions must be reversed due to cumulative prejudice. Because there are no errors to cumulate, defendant's claim fails. (See *In re Reno* (2012) 55 Cal.4th 428, 483; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

### F. *Parole Revocation Fine*

Defendant contends the trial court improperly imposed and stayed a $10,000 parole revocation fine pursuant to section 1202.45. Defendant argues that imposition of the fine was error because his sentence does not include a parole period. The Attorney General concedes the error.

Section 1202.45 mandates that "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."

Defendant was sentenced two consecutive terms of life without the possibility of parole. Thus, section 1202.45 does not apply. (See *People v. Price* (2017) 8 Cal.App.5th 409, 465.) Accordingly, we shall strike the parole revocation fine.

**G.** *Dueñas Error*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced, defendant contends the trial court violated his due process rights under the federal and California Constitutions because it failed to determine whether he had the ability to pay a fine and two assessments before it imposed them. Defendant challenges the imposition of a $10,000 restitution fine (§ 1202.4), an $80 court operations assessment (§ 1465.8), and a $60 court facilities assessment (Gov. Code, § 70373). Alternatively, defendant argues that if this court determines that his ability-to-pay claim has been forfeited, his trial counsel provided ineffective assistance by failing to object to the fine and the assessments.

The Attorney General asserts that defendant's challenge to the restitution fine has been forfeited by his failure to object to it below. The Attorney General also argues that *Dueñas* was wrongly decided as to restitution fines and that the issue should be analyzed under the excessive fines clause of the Eighth Amendment to the federal Constitution. Regarding the court operations and court facilities assessments, the Attorney General "does not seek to uphold the imposition of these assessments on those who have no ability to pay," but asserts that the imposition of the assessments without an ability-to-pay finding was harmless.

### 1. Trial Court Proceedings

After the trial court imposed two consecutive terms of life without the possibility of parole, the court ordered defendant to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), an $80 court operations assessment pursuant to section 1465.8, and a $60 court facilities assessment pursuant to Government Code section 70373. Defendant did not object.

### 2. *Dueñas*

In *Dueñas*, the defendant at sentencing requested a hearing to determine her ability to pay various amounts that were imposed by the trial court. (*Dueñas*, *supra*, 30 Cal.App.5th

at p. 1162.) At a subsequent ability-to-pay hearing the court reviewed the defendant's "uncontested declaration concerning her financial circumstances." (*Id.* at p. 1163.) The court waived attorney's fees based on the defendant's indigence but rejected her constitutional claim that due process required the court to consider her ability to pay other fines and assessments, including a minimum restitution fine under section 1202.4, a $40 court operations assessment under section 1465.8, and a $30 court facilities assessment under Government Code section 70373. (*Dueñas*, *supra*, at p. 1163; see *id*. at p. 1169.)

On appeal, the *Dueñas* court observed that the purpose of the $40 assessment under section 1465.8 is "[t]o assist in funding court operations" (§ 1465.8, subd. (a)(1)), and that the purpose of the $30 assessment under Government Code section 70373 is "[t]o ensure and maintain adequate funding for court facilities" (Gov. Code, § 70373, subd. (a)(1)). Regarding such "fee-generating statutes" and their impact on indigent defendants, the *Dueñas* court stated that " '[c]riminal justice debt and associated collection practices can damage credit, interfere with a defendant's commitments, such as child support obligations, restrict employment opportunities and otherwise impede reentry and rehabilitation. . . .' [¶] These additional, potentially devastating consequences suffered only by indigent persons in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1165, 1168.) Based primarily on a trio of cases—*Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660—the *Dueñas* court concluded that imposition of the court operations assessment and court facilities assessment without a determination of the defendant's ability to pay was "fundamentally unfair" and violated due process under the federal and California Constitutions. (*Dueñas*, *supra*, at p. 1168.)

Regarding restitution fines, the *Dueñas* court further stated that a wealthy defendant who successfully completes probation would have an absolute right to have the charges against the defendant dismissed under section 1203.4, subdivision (a)(1). (*Dueñas*, *supra*,

40

30 Cal.App.5th at pp. 1170, 1171.)  An indigent probationer, on the other hand, who could not afford the mandatory restitution fine, would have to persuade the trial court that dismissal of the charges and relief from the penalties of the offense were in the interest of justice.  (*Ibid.*, citing § 1203.4, subd. (a)(1).)  The *Dueñas* court found that "[t]he statutory scheme thus results in a limitation of rights to those who are unable to pay," and that section 1202.4 is "not a substitute for due process."  (*Dueñas*, *supra*, at p. 1171, fn. omitted.)  The *Dueñas* court concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.)

### 3. Forfeiture

The Courts of Appeal have reached different conclusions regarding whether a due process claim under *Dueñas* is forfeited if the defendant failed to object in the trial court to the imposition of the restitution fine, the court operations assessment, or the court facilities assessment.  (See, e.g., *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 197, 206 [*Dueñas* claim forfeited]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031-1034 [due process objection based on *Dueñas* not forfeited]; *People v. Santos* (2019) 38 Cal.App.5th 923, 932 [claim based on *Dueñas* not forfeited].)  We determine that defendant forfeited his ability-to-pay claim.

The trial court imposed the maximum, statutorily authorized restitution fine of $10,000 under section 1202.4.  Section 1202.4 provides that "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense." (*Id.*, subd. (b)(1).)  The statute sets forth a minimum and maximum fine.  (*Ibid.*)  Section 1202.4 further provides that "[t]he court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record.  A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine."  (*Id.*, subd. (c).)  However, "[i]*nability*

41

*to pay may be considered . . . in increasing the amount of the restitution fine in excess of the*" statutory minimum fine.  (*Ibid.*, italics added.)  Specifically, in setting the restitution fine in excess of the statutory minimum, "the court *shall consider* any relevant factors, including, but not limited to, the defendant's *inability to pay . . . .*"  (*Id.*, subd. (d), italics added.)  The defendant "bear[s] the burden of demonstrating" an inability to pay.  (*Ibid.*)  "Express findings by the court as to the factors bearing on the amount of the fine shall not be required.  A separate hearing for the fine shall not be required."  (*Ibid.*)

Significantly, "a defendant forfeits on appeal any 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' in the absence of objection below.  [Citations.]"  (*People v. Wall* (2017) 3 Cal.5th 1048, 1075.)  In this case, by failing to object below, defendant forfeited his claim that the trial court failed to exercise its discretion to determine his ability to pay.  (See *People v. Nelson* (2011) 51 Cal.4th 198, 227 [ability-to-pay claim forfeited where the defendant could have objected at sentencing "if he believed inadequate consideration was being given to" the ability-to-pay factor for the restitution fine].)

Defendant argues that "before *Duenas*, [he], and his counsel, could not have known that [he] had a right to a hearing on his ability to pay a fine or the other monetary assessments."  However, as stated, subdivision (d) of section 1202.4 mandates that "the court . . . consider any relevant factors, including . . . the defendant's inability to pay" in setting a restitution fine above the statutory minimum.  Because the trial court imposed the maximum restitution fine, defendant was "obligated to object to the amount of the fine and demonstrate his inability to pay anything more than the [statutory] minimum.  Such an objection would not have been futile under governing law at the time of his sentencing hearing.  [Citations.]"  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)  In other words, "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4 . . .) expressly permitted such a challenge.  [Citation.]"  (*People v.*

*Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) "Thus, even if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case [defendant] forfeited any ability-to-pay argument regarding the restitution fine by failing to object." (*Ibid.*)

We also determine that defendant forfeited his ability-to-pay claim regarding the $80 court operations assessment and the $60 court facilities assessment. "[I]f [defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional [$140] in fees." (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.)

### 4. *Ineffective Assistance of Counsel*

Defendant contends that his trial counsel provided ineffective assistance by failing to object to the restitution fine, the court operations assessment, and the court facilities assessment.

"[A] defendant claiming the ineffective assistance of counsel is required to show both that counsel's performance was deficient and that counsel's errors prejudiced the defense." (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) Regarding prejudice, a "defendant must show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).) We conclude that defendant has failed to demonstrate he was prejudiced by counsel's failure to object to the fine and assessments.

"[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." (*People v. Frye* (1994) 21 Cal.App.4th 1483, 1487 (*Frye*).) This includes a defendant's ability to earn prison wages. (*Ibid.*)

Here, defendant was sentenced two consecutive terms of life without the possibility of parole, and the trial court could consider defendant's ability to earn prison wages while

serving his life sentences.  (See *Frye*, *supra*, 21 Cal.App.4th at p. 1487.)  Although defendant argues that his mental illness made it "doubtful that [he] will be able to hold a job in prison," prejudice requires a showing of "a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  The trial court was familiar with defendant's mental health after observing him throughout the trial, hearing his testimony, and hearing the testimony of a jail psychiatrist during the sanity phase who had diagnosed defendant with schizophrenia.  Defendant's mental health was also detailed in the probation report, as was his employment history as a busboy, car washer, and construction worker, which were jobs he held for not longer than two months at a time "due to failure to appear for work and an inability to work with others."

On this record, defendant has not shown "a reasonable probability" that the trial court would have reduced or stayed the restitution fine or stayed the assessments had trial counsel objected to them and requested a hearing.  (*Strickland*, *supra*, 466 U.S. at p. 694.)  Thus, we reject defendant's claim that his trial counsel provided ineffective assistance when he failed to object to the trial court's imposition of the restitution fine, court operations assessment, and court facilities assessment on the basis of defendant's inability to pay.

## IV.    DISPOSITION

The Penal Code section 1202.45 parole revocation fine is stricken.  As so modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment reflecting that the parole revocation fine (Pen. Code, § 1202.45) has been stricken and to forward a certified copy of the abstract to the California Department of Corrections and Rehabilitation.

_____
BAMATTRE-MANOUKIAN, J.

I CONCUR:

_____
ELIA, J.

***People v. Henderson***
**H046281**

PREMO, Acting P.J., Concurring.

I concur with my colleagues' resolution of Henderson's claims but write separately to explain how I believe his challenge to the fines and assessments under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 should be resolved. I agree with the majority that Henderson forfeited his right to challenge the $10,000 restitution fund fine (Pen. Code, § 1202.4). Under Penal Code section 1202.4, subdivision (d), if the trial court imposes a restitution fine above the minimum, it "shall consider any relevant factors, including, . . . the defendant's inability to pay . . . . A defendant shall bear the burden of demonstrating his or her inability to pay." Since the trial court here imposed a restitution fine above the minimum amount, we must presume that it considered the relevant factors and determined that Henderson had an ability to pay. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) By failing to object below, Henderson has forfeited his claim. (*Ibid.*)

I differ from my colleagues in their treatment of the $80 court operations assessment (Pen. Code, § 1465.8) and the $60 court facilities assessment (Gov. Code, § 70373). Because the statutes authorizing those assessments do not contain language similar to that of Penal Code section 1202.4, subdivision (d) obligating the trial court to consider a defendant's ability to pay, I would not find that Henderson's failure to object at his pre–*Dueñas* sentencing hearing resulted in the forfeiture of that objection. Instead, I would find that the failure to object is harmless beyond a reasonable doubt. Unlike the unemployed probationer in *Dueñas*, Henderson has been sentenced to two consecutive life terms without the possibility of parole. "Wages in California prisons currently range from $12 to $56 a month." (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) Since the challenged assessments only total $140, Henderson will have sufficient time to earn this amount while incarcerated even if we assume that he will earn only the minimum wage. Any argument that Henderson is unable to pay the challenged assessments is foreclosed. (See *ibid*. [*Dueñas* error harmless beyond a reasonable doubt

when defendant was sentenced to six years in prison and ordered to pay $370 in fines and fees]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139 [*Dueñas* error harmless beyond a reasonable doubt when defendant was sentenced to eight years in prison and ordered to pay $370 in fines and fees]; *People v. Santos* (2019) 38 Cal.App.5th 923, 934 [a defendant's present ability to pay includes prison wages].)

For those same reasons, Henderson's trial counsel's failure to raise *Dueñas* at sentencing could not amount to constitutionally ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668.

_____                _____
                                       Premo, Acting P.J.

People v. Henderson
H046281